2022R00178/JLH, AW & JF

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Stacey D. Adams |
| | : | |
| v. | : | Mag. No. 25-15265 |
| | : | |
| MUHAMMAD SAAD SHOUKAT, MUHAMMAD ARHAM SHOUKAT, MUHAMMED SHAHWAIZ SHOUKAT, DANIYAL "DAN" KHAN, and IZUNNA "ZUNNIE" OKONKWO | : | **CRIMINAL COMPLAINT** |

I, Anthony Bellitti, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

*Anthony Bellitti*
Anthony Bellitti, Special Agent
Federal Bureau of Investigation

Special Agent Bellitti attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 31st day of July, 2025.

*S/Hon. Stacey D. Adams*
Hon. Stacey D. Adams
United States Magistrate Judge

# ATTACHMENT A

## Count 1
## (Conspiracy to Commit Securities Fraud)

From at least in or around June 2020 through at least in or around February 2024, in the District of New Jersey and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT,**
**MUHAMMED SHAHWAIZ SHOUKAT,**
**DANIYAL "DAN" KHAN, and**
**IZUNNA "ZUNNIE" OKONKWO**,

did knowingly and intentionally conspire and agree with each other to commit securities fraud, that is, MUHAMMAD SAAD SHOUKAT, MUHAMMAD ARHAM SHOUKAT, MUHAMMED SHAHWAIZ SHOUKAT, DANIYAL "DAN" KHAN, and IZUNNA "ZUNNIE" OKONKWO agreed with each other and others to make timely securities transactions based on material nonpublic information ("MNPI") provided by a coconspirator ("CC-1") to MUHAMMAD SAAD SHOUKAT, which CC-1 obtained from his employment at an investment bank (the "Investment Bank") and provided to MUHAMMAD SAAD SHOUKAT in breach of a duty to the Investment Bank, contrary to Title 18, United States Code, Section 1348.

In violation of Title 18, United States Code, Section 1349.

**Count 2**
**(Conspiracy to Commit Insider Trading)**

From at least in or around June 2020 through at least in or around February 2024, in the District of New Jersey, and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT,**
**MUHAMMED SHAHWAIZ SHOUKAT,**
**DANIYAL "DAN" KHAN, and**
**IZUNNA "ZUNNIE" OKONKWO**,

did willfully and knowingly combine, conspire, confederate and agree with each other and others, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, to use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

In violation of Title 18, United States Code, Section 371.

**Count 3**
**(Securities Fraud)**

From in or around June 2020 to in or around February 2024, in the District of New Jersey and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT,**
**MUHAMMED SHAHWAIZ SHOUKAT,**
**DANIYAL "DAN" KHAN, and**
**IZUNNA "ZUNNIE" OKONKWO**,

did knowingly, and with the intent to defraud, execute and attempt to execute a scheme and artifice to (a) defraud a person in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934; and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, that is, the defendants and co-schemers executed and attempted to execute a scheme to defraud in knowing violation of duties owed by CC-1 to the Investment Bank—specifically, CC-1 obtained MNPI about pending deals involving at least nine companies (the "Companies") in the course of his employment at the Investment Bank and provided that MNPI to MUHAMMAD SAAD SHOUKAT in anticipation that MUHAMMAD SAAD SHOUKAT would trade securities in the Companies based on MNPI, and MUHAMMAD SAAD SHOUKAT, knowing that the information had been obtained in breach of a duty, willfully used it to execute and cause others to execute securities transactions in the Companies, and also provided the MNPI to MUHAMMAD ARHAM SHOUKAT, MUHAMMED SHAHWAIZ SHOUKAT, DANIYAL "DAN" KHAN, and IZUNNA "ZUNNIE" OKONKWO, all of whom knowing that the information had been obtained in breach of a duty, also willfully used it to execute securities transactions in the Companies.

In violation of Title 18, United States Code, Section 1348 and Section 2.

**<u>Count 4</u>**
**(Insider Trading)**

From in or around June 2020 to in or around February 2024, in the District of New Jersey, and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT,**
**MUHAMMED SHAHWAIZ SHOUKAT,**
**DANIYAL "DAN" KHAN, and**
**IZUNNA "ZUNNIE" OKONKWO**,

did knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ, and cause others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, that is, in violation of his duties of trust and confidence to the Investment Bank, CC-1 provided material nonpublic information concerning the Companies to MUHAMMAD SAAD SHOUKAT, in anticipation that he and others would trade securities of the Companies on that information, and MUHAMMAD SAAD SHOUKAT knowing that the information had been obtained in breach of a duty, willfully used it to execute and cause others to execute the securities transactions in the Companies, and also provided the MNPI to MUHAMMAD ARHAM SHOUKAT, MUHAMMED SHAHWAIZ SHOUKAT, DANIYAL "DAN" KHAN, and IZUNNA "ZUNNIE" OKONKWO, all of whom knowing that the information had been obtained in breach of a duty, also willfully used it to execute securities transactions in the Companies.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

**<u>Count 5</u>**
**(Conspiracy to Commit Wire Fraud)**

From at least in or around June 2020 through at least in or around February 2024, in the District of New Jersey, and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT,**
**MUHAMMED SHAHWAIZ SHOUKAT,**
**DANIYAL "DAN" KHAN, and**
**IZUNNA "ZUNNIE" OKONKWO,**

did knowingly and intentionally conspire to agree with each other and others to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, and sounds, specifically CC-1 agreed with MUHAMMAD SAAD SHOUKAT to misappropriate MNPI from the Investment Bank relating to the Companies and provide it to MUHAMMAD SAAD SHOUKAT so that he could use the information to execute timely securities transactions and provide the information to others, including MUHAMMAD ARHAM SHOUKAT, MUHAMMED SHAHWAIZ SHOUKAT, DANIYAL "DAN" KHAN, and IZUNNA "ZUNNIE" OKONKWO so that they could use the MNPI to make timely securities transactions in the Companies, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

**Count 6**
**(Wire Fraud)**

From at least in or around June 2020 through at least in or around February 2024, in the District of New Jersey, and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT,**
**MUHAMMED SHAHWAIZ SHOUKAT,**
**DANIYAL "DAN" KHAN, and**
**IZUNNA "ZUNNIE" OKONKWO,**

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, specifically CC-1 misappropriated MNPI from the Investment Bank relating to the Companies and provided it to MUHAMMAD SAAD SHOUKAT so that he could use the information to execute timely securities transactions and provide the information to others, including MUHAMMAD ARHAM SHOUKAT, MUHAMMED SHAHWAIZ SHOUKAT, DANIYAL "DAN" KHAN, and IZUNNA "ZUNNIE" OKONKWO so that they could use the MNPI to make timely securities transactions in the Companies

In violation of Title 18, United States Code, Section 1343 and Section 2.

**Count 7**
**(Conspiracy to Commit Market Manipulation)**

From in or around July 2021 through in or around November 2021, in the District of New Jersey and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT and**
**MUHAMMAD ARHAM SHOUKAT,**

did knowingly and intentionally conspire and agree with each other and others to commit securities fraud that is, MUHAMMAD SAAD SHOUKAT and MUHAMMAD ARHAM SHOUKAT engaged in a scheme to manipulate the price of securities of Olema Pharmaceuticals Inc., a publicly traded company, by injecting inaccurate information into the marketplace, contrary to Title 18, United States Code, Section 1348.

In violation of Title 18, United States Code, Section 1349.

**Count 8**
**(Conspiracy to Commit Market Manipulation)**

From in or around December 2021 through in or around April 2022, in the District of New Jersey and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT, and**
**MUHAMMED SHAHWAIZ SHOUKAT,**

did knowingly and intentionally conspire and agree with each other and others to commit securities fraud that is, MUHAMMAD SAAD SHOUKAT, MUHAMMAD ARHAM SHOUKAT, and MUHAMMED SHAHWAIZ SHOUKAT engaged in a scheme to manipulate the price of securities of Opiant Pharmaceuticals Inc., a publicly traded company, by injecting inaccurate information into the marketplace, contrary to Title 18, United States Code, Section 1348.

In violation of Title 18, United States Code, Section 1349.

**Count 9**
**(Market Manipulation)**

From at least in or around July 2021 through in or around November 2021, in the District of New Jersey, and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT and**
**MUHAMMAD ARHAM SHOUKAT,**

knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, and aided and abetted others known and unknown to the grand jury, and attempted to do so by: (a) employing devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons—that is, MUHAMMAD SAAD SHOUKAT and MUHAMMAD ARHAM SHOUKAT engaged in a scheme, with each other and others, to manipulate the price of securities of Olema Pharmaceuticals Inc., a publicly traded company, by injecting inaccurate information into the marketplace.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

**Count 10**
**(Market Manipulation)**

From in or around December 2021 through in or around April 2022, in the District of New Jersey, and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT, and**
**MUHAMMED SHAHWAIZ SHOUKAT,**

knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, and aided and abetted others known and unknown to the grand jury, and attempted to do so by: (a) employing devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons—that is, MUHAMMAD SAAD SHOUKAT, MUHAMMAD ARHAM SHOUKAT, and MUHAMMED SHAHWAIZ SHOUKAT engaged in a scheme, with each other and others, to manipulate the price of securities of Opiant Pharmaceuticals Inc., a publicly traded company, by injecting inaccurate information into the marketplace.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

**Count 11**
**(Conspiracy to Commit Wire Fraud)**

From in or around July 2021 through in or around November 2022, in the District of New Jersey, and elsewhere, the defendants,

**MUHAMMAD SAAD SHOUKAT and**
**MUHAMMAD ARHAM SHOUKAT,**

did knowingly and intentionally conspire to agree with each other and others to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, and sounds, that is, MUHAMMAD SAAD SHOUKAT and MUHAMMAD ARHAM SHOUKAT agreed with each other and others manipulate the price of securities of Olema Pharmaceuticals Inc., a publicly traded company, by injecting inaccurate information into the marketplace, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

**Count 12**
**(Conspiracy to Commit Wire Fraud)**

From in or around December 2021 through in or around April 2022, in the District of New Jersey, and elsewhere, defendants

**MUHAMMAD SAAD SHOUKAT,**
**MUHAMMAD ARHAM SHOUKAT, and**
**MUHAMMED SHAHWAIZ SHOUKAT,**

did knowingly and intentionally conspire to agree with each other and others to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, and sounds, that is, MUHAMMAD SAAD SHOUKAT, MUHAMMAD ARHAM SHOUKAT, and MUHAMMED SHAHWAIZ SHOUKAT agreed with each other and others to manipulate the price of securities of Opiant Pharmaceuticals Inc., a publicly traded company, by injecting inaccurate information into the marketplace, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Anthony Bellitti, am a Special Agent of the Federal Bureau of Investigation. The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including business records, bank records, records from internet service providers, and other documents. Because this complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## BACKGROUND AND OVERVIEW

### Relevant Individuals and Entities

1. At times relevant to this Criminal Complaint:

a. Defendant MUHAMMAD SAAD SHOUKAT ("SAAD SHOUKAT") was pursuing a Ph.D. in Immunology at a university in England and frequently traded in securities, mostly in the healthcare sector. He previously graduated from a university in Cambridge, Massachusetts and held various finance-related jobs.

b. Defendant MUHAMMAD ARHAM SHOUKAT ("ARHAM SHOUKAT") resided in Islamabad, Pakistan and Kuala Lumpur, Malaysia. After earning a master's degree from a university in New York City, he held senior positions at organizations in Pakistan, including his family's Pakistan-based construction management business.

c. Defendant MUHAMMAD SHAHWAIZ SHOUKAT ("SHAHWAIZ SHOUKAT") resided in Amsterdam, the Netherlands. He graduated from a university in Philadelphia, Pennsylvania and then worked for several years in finance-related jobs in the U.S. and Amsterdam.

d. SAAD SHOUKAT, ARHAM SHOUKAT, and SHAHWAIZ SHOUKAT (collectively, the "SHOUKATS") were brothers and dual United States and Pakistan citizens.

e. A coconspirator not charged in this Complaint ("CC-1") resided in San Francisco, California and worked as an investment banker in the San Francisco office of a multi-national investment bank headquartered in New York, New York (the "Investment Bank"). In or around the summer of 2018, CC-1 and SAAD SHOUKAT met while interning at a different multi-national investment bank. CC-1

and SAAD SHOUKAT subsequently remained close friends, and CC-1 invited SAAD SHOUKAT to his wedding in or around March 2021.

f. Defendant DANIYAL "DAN" KHAN ("KHAN") resided in England and was SAAD SHOUKAT's close friend from childhood.

g. Defendant IZUNNA "ZUNNIE" OKONKWO ("OKONKWO") went to graduate school in Palo Alto, California and had a family home in Atlanta, Georgia. Okonkwo was SAAD SHOUKAT's close friend from college.

h. "Individual-1" resided in Pakistan and ran a multi-million-dollar textile company. Individual-1 was SAAD SHOUKAT's sports coach growing up, and they remained close.

i. The NASDAQ Stock Exchange ("NASDAQ") and the New York Stock Exchange ("NYSE") are United States stock exchanges, each with servers located in New Jersey.

## Overview of the Criminal Schemes

2. The charges in this case arise from three overlapping securities fraud schemes that occurred at various points from in or around June 2020 to at least in or around February 2024: (i) a multi-million-dollar insider trading scheme (the "Insider Trading Scheme"); (ii) a scheme to manipulate the stock price of a biopharmaceutical company developing a treatment for breast cancer (the "Olema Manipulation Scheme"); and (iii) a scheme to manipulate the stock price of a different biopharmaceutical company seeking to prevent opioid overdoses (the "Opiant Manipulation Scheme," together with the Olema Manipulation Scheme, the "Market Manipulation Schemes").

### The Insider Trading Scheme

3. The Investment Bank where CC-1 worked was actively involved in multiple mergers and acquisitions of publicly traded healthcare and biopharmaceutical companies. CC-1 obtained MNPI about many of these pending deals, either by working on deals directly or from others who did. CC-1 illegally shared MNPI about at least nine of these deals with SAAD SHOUKAT, who traded on that information by himself or through others. SAAD SHOUKAT also tipped off others—including co-conspirators ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, KHAN, and OKONKWO—who similarly traded and profited from the MNPI.

4. Overall, SAAD SHOUKAT and his co-conspirators' total profits from the Insider Trading Scheme was at least approximately $41 million.

**Olema Manipulation Scheme**

5. SAAD SHOUKAT and ARHAM SHOUKAT, together and with others, actively manipulated the stock price of Olema, a publicly traded company headquartered in California, with securities listed on NASDAQ (ticker: OLMA). Olema focused on developing breast cancer treatment through a drug called OP-1250. Unlike the other deals referenced in this Complaint, SAAD SHOUKAT's interest in Olema does not appear to have stemmed from his relationship with CC-1, and Olema had no apparent relationship to the Investment Bank.

6. Instead, SAAD SHOUKAT, on his own and with others, researched Olema and initially believed in the efficacy of OP-1250. From at least in or around the spring of 2021, SAAD SHOUKAT and ARHAM SHOUKAT began investing in Olema stock and encouraged others to invest in it. After taking substantial positions in Olema, SAAD SHOUKAT and ARHAM SHOUKAT, together and with others, used hacking techniques—including spoofing and social engineering[1]—to access confidential information, which showed that OP-1250 was less effective than they had hoped. SAAD SHOUKAT, ARHAM SHOUKAT, and others then falsified the OP-1250 data and publicly disseminated it in a manner that made it look like the data was real and came from Olema. The release of the false data—which inflated the drug's efficacy—temporarily caused Olema's stock price to increase, during which SAAD SHOUKAT, ARHAM SHOUKAT, and others profited and/or avoided losses by selling their shares in Olema stock. This scheme caused over one million dollars in losses to victim investors, including investors in New Jersey.

**Opiant Manipulation Scheme**

7. The SHOUKATS and others also manipulated the stock price of Opiant, a California-based pharmaceutical company with shares that publicly traded on the NASDAQ stock exchange (ticker: OPNT). Opiant was developing an opioid overdose treatment. CC-1 provided MNPI to SAAD SHOUKAT about a company seeking to acquire Opiant. Based on that MNPI, SAAD SHOUKAT and others bought Opiant stock. But that potential acquisition stalled, and SAAD SHOUKAT and others were stuck with their stock purchases.

8. In response, in or around April 2022, the SHOUKATS and others—using a fake Opiant website and fake Opiant email addresses that appeared legitimate—caused the publication of a fake press release announcing a purported merger and acquisition involving Opiant and another company. The fake press release drove up Opiant's stock approximately 29%. The SHOUKATS and others

[1] Spoofing is a technique through which cybercriminals disguise themselves as a known or trusted source. Social engineering is the tactic of manipulating, influencing, or deceiving a victim to gain control or access to personal information and/or accounts.

profited by selling off shares during that spike, which also caused over one million dollars in losses to victim investors, including investors in New Jersey.

## THE INSIDER TRADING SCHEME

9. From in or around September 2018 through in or around July 2023, CC-1 served as an analyst, and later as an associate, at the Investment Bank. In both rolls, CC-1 worked on mergers and acquisitions involving healthcare and biopharmaceutical companies. CC-1 routinely had access to MNPI about deals on which he worked and other deals on which members of his group at the Investment Bank worked.

10. As an Investment Bank employee, CC-1 had a duty not to disclose confidential information and MNPI that he learned through his employment at the Investment Bank, or to use such information for his benefit or the benefit of others. Annually, CC-1 signed a "Compliance Manual Affirmation," in which he affirmed, among other things, that he read and understood the Investment Bank's compliance policies and procedures, including those relating to personal securities trading and the handling of confidential information, and that he understood that "a violation" of those policies could result in "criminal liability." Those policies: (a) summarized "insider trading" law; (b) defined the meaning of confidential, material, and non-public information; and (c) stated that employees were prohibited from disclosing any inside information to any person outside the Investment Bank, "except as required in the performance of the [Investment Bank]'s business activities."

11. Despite these prohibitions, CC-1 repeatedly provided SAAD SHOUKAT MNPI about upcoming acquisitions or tender offers for at least nine publicly traded healthcare and biopharmaceutical companies for which the Investment Bank was advising clients. SAAD SHOUKAT, either on his own or through others, traded profitably in these deals and tipped others—including ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, OKONKWO, and KHAN—who also traded and profited.

12. During CC-1's tenure at the Investment Bank, CC-1 and SAAD SHOUKAT routinely communicated over encrypted messaging apps, through which SAAD SHOUKAT saved CC-1's contact information using the monikers "Ho" or CC-1's first initial and last name. CC-1 and SAAD SHOUKAT's messages often involved stocks and the biopharmaceutical industry. By at least in or around 2020, their discussions also included CC-1 providing SAAD SHOUKAT MNPI. CC-1 knew that SAAD SHOUKAT was trading on the MNPI. At times, CC-1 and SAAD SHOUKAT also discussed how SAAD SHOUKAT could use this MNPI to pitch investment recommendations to others within the industry, leaving the false impression that SAAD SHOUKAT was an expert stock analyst. For example, SAAD SHOUKAT wrote to CC-1 on an encrypted messaging app that SAAD SHOUKAT wanted these industry investors to "say, 'this kid has a golden hand,'" as follows:




13. During the same period that CC-1 was providing SAAD SHOUKAT with MNPI, SAAD SHOUKAT gave CC-1 at least one Rolex watch and other gifts. SAAD SHOUKAT frequently gave CC-1 job advice and connected him to others within the industry for potential employment opportunities. On at least one occasion, SAAD SHOUKAT also helped CC-1 on a work assignment for the Investment Bank pertaining to a biotechnology company.

14. The MNPI that CC-1 tipped to SAAD SHOUKAT—and that SAAD SHOUKAT, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, KHAN, OKONKWO, and others traded on based on those tips—included information pertaining to companies and deals listed in the following chart ("Chart-1"):

| **Company & Ticker** | **Approx. Date of Public Announcement** | **Announced Event** |
|---|---|---|
| Immunomedics (Ticker: IMMU) | 9/13/2020 | Gilead Sciences, Inc. ("Gilead") to acquire IMMU |
| Aimmune Theraeutics, Inc. ("Aimmune") (Ticker: AIMT) | 8/31/2020 | Nestlé Health Science ("Nestlé") to acquire AIMT |
| Five Prime Therapeutics, Inc. ("Five Prime") (Ticker: FPRX) | 3/4/2021 | Amgen, Inc. ("Amgen") to acquire FPRX |
| Adamas Pharmaceuticals, Inc. ("Adamas") (Ticker: ADMS) | 10/11/2021 | Supernus Pharmaceuticals, Inc. ("Supernus") to acquire ADMS |
| Sierra Oncology, Inc. ("Sierra") (Ticker: SRRA) | 4/13/2022 | GlaxoSmithKline plc ("GSK") to acquire SRRA |
| GBT Therapeutics, Inc. ("GBT") (Ticker: GBT) | 8/3/2022 | News article: GBT to be potentially acquired |
| | 8/8/2022 | Official: Pfizer, Inc. ("Pfizer") to acquire GBT |
| Oak Street Health, Inc. ("Oak Street") (Ticker: OSH) | 2/8/2023 | CVS Health Corp. ("CVS") to acquire OSH |
| Reata Pharmaceuticals ("Reata") (Ticker: RETA) | 7/28/2023 | Biogen Inc. ("Biogen") to acquire RETA |
| ImmunoGen, Inc. ("ImmunoGen") (Ticker: IMGN) | 11/30/2023 | AbbVie Inc. ("AbbVie") to acquire IMGN |

15. For some trades, SAAD SHOUKAT, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, KHAN, and OKONKWO used brokerage accounts or spread betting accounts in their own names to make trades. But they also used and attempted to use several tactics to mask their trading activities. For example:

a. SHAHWAIZ SHOUKAT attempted to hide most of his illicit trading by using brokerage accounts in the name of his ex-wife ("Individual-2") who resided in New York City. Individual-2 worked for a fashion company and had no experience in finance, investing, or the healthcare and biopharmaceutical industries. In or around April 2022, SHAHWAIZ SHOUKAT emailed Individual-2 a spreadsheet listing some of his alleged trading activities using her brokerage accounts.

b. SAAD SHOUKAT and OKONKWO caused accounts in the name of one of OKONKWO's relatives ("Okonkwo Relative-1") to make profitable trades related to at least seven deals. Okonkwo Relative-1, a dual U.S. and Nigerian citizen, resided in Atlanta, Georgia and ran several companies that operated primarily in Nigeria.

c. SAAD SHOUKAT and OKONKWO drafted a written agreement in which OKONKWO allowed SAAD SHOUKAT to access and make trades though

OKONKWO's accounts in exchange for OKONKWO getting approximately 50% of trading profits.

d. KHAN similarly traded securities in his own name for SAAD SHOUKAT, and KHAN received a percentage of those trading profits.

16. Brokerage accounts and/or spread betting accounts in the names of the people in the below chart ("Chart-2") profitably traded in the following tickers based on MNPI that SAAD SHOUKAT received from CC-1 and then provided to others, including ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, KHAN, OKONKWO:

| Ticker | Saad Shoukat | Okonkwo | Okonkwo Relative-1 | Arham Shoukat | Shahwaiz Shoukat | Individual-2 | Khan |
|---|---|---|---|---|---|---|---|
| IMMU | ✓ | ✓ | ✓ | | | ✓ | |
| AIMT | | | ✓ | | | ✓ | |
| FPRX | | ✓ | ✓ | ✓ | | ✓ | ✓ |
| ADMS | | | | ✓ | | ✓ | |
| SRRA | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| GBT | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| OSH | ✓ | | | ✓ | ✓ | | ✓ |
| RETA | | ✓ | ✓ | ✓ | ✓ | ✓ | |
| IMGN | | ✓ | ✓ | ✓ | | ✓ | |

17. SAAD SHOUKAT, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, KHAN, OKONKWO, and others used additional methods to mask and launder their profitable insider trading in these and other securities. For example:

a. SAAD SHOUKAT and SHAHWAIZ SHOUKAT funneled millions of dollars in trading profits to SAAD SHOUKAT's bank account in the Channel Islands and to a Malaysia-based company that ARHAM SHOUKAT controlled.

b. SHAHWAIZ SHOUKAT used Individual-2's bank accounts to transfer illicit trading profits, some of which SHAHWAIZ SHOUKAT caused to be transferred to himself overseas.

c. KHAN, using his and his wife's bank accounts, held illicit trading proceeds for SAAD SHOUKAT, and SAAD SHOUKAT directed KHAN where and how to transfer those funds.

d. OKONKWO held and maintained funds for SAAD SHOUKAT and let SAAD SHOUKAT use his credit card freely. OKONKWO also bought an apartment in London and let SAAD SHOUKAT live there.

18. As part of the scheme, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, KHAN, and OKONKWO knew about and/or had their own personal relationships with CC-1. For example:

a. As early as in or around 2019, SAAD SHOUKAT introduced CC-1 to SHAHWAIZ SHOUKAT, who exchanged emails with CC-1 using CC-1's Investment Bank email address.

b. SAAD SHOUKAT sent ARHAM SHOUKAT and SHAHWAIZ SHOUKAT confidential documents from the Investment Bank pertaining to potential deals, and SAAD SHOUKAT separately identified CC-1 to them as his source.

c. OKONKWO knew that CC-1 worked at the Investment Bank, and SAAD SHOUKAT and OKONKWO communicated on an encrypted messaging app about the impending Reata deal before it was public. SAAD SHOUKAT exchanged messages with OKONKWO about helping CC-1 find a new job, and SAAD SHOUKAT and CC-1 discussed traveling with OKONKWO.

d. SAAD SHOUKAT introduced CC-1 to KHAN, and CC-1 and KHAN communicated directly with each other using encrypted messaging apps. Among other things, they discussed Rolex watches, a death in SAAD SHOUKAT's family, and CC-1 potentially visiting Europe. In addition, KHAN sent encrypted messages to ARHAM SHOUKAT that identified CC-1 by his initials as SAAD SHOUKAT's source.

19. On or about October 22, 2022, SAAD SHOUKAT messaged with ARHAM SHOUKAT about a dispute SAAD SHOUKAT was having with KHAN related to how much in trading profits KHAN owed SAAD SHOUKAT. During that conversation, they also discussed the risks associated with their Insider Trading Scheme:

| | |
|---|---|
| SAAD SHOUKAT | When you speak to dan [KHAN] next need you to tell him I'm cutting my patience with him. I had a long chat with him about the capital money. Told him agreement was 50% of what was made. |
| ARHAM SHOUKAT | you guys should just settle your accounts and not trade off each others backs |
| SAAD SHOUKAT: | Yeah. But hard to take 2M from someone. Not very straight forward. |
| | . . . . |
| SAAD SHOUKAT | He's acting like he did the hard work to get the deal |
| | . . . . |
| SAAD SHOUKAT | I told him in Lahore indirectly. If you fuck me I have less to lose. |
| ARHAM SHOUKAT | that's what I used to tell you |

| | |
|---|---|
| SAAD SHOUKAT | And you will get fucked harder for IT [referring to Insider Trading] |
| ARHAM SHOUKAT | You need to watch your back |
| SAAD SHOUKAT | Yeah. Evidently. Zunnie [OKONKWO] I trust. Others I don't. |

* * *

20. The subsections below discuss each of the nine companies/deals listed in Chart-1 and Chart-2.

**<u>Immunomedics, Aimmune, Five Prime, and Adamas</u>**

21. During the scheme, SAAD SHOUKAT used MNPI that CC-1 provided to give stock tips to Individual-1 about pending deals, including the deals listed in Chart 1 involving Immunomedics, Aimmune, Five Prime, and Adamas.

22. In or around January and February 2022, SAAD SHOUKAT attempted to convince Individual-1 to buy Opiant stock. During a series of exchanges with Individual-1 using an encrypted messaging app, SAAD SHOUKAT disclosed that his source for Opiant was a "Banker. Friend. Source for all deals." SAAD SHOUKAT named the Investment Bank where his "source" worked and said that it was "represent[ing] opiant."

23. SAAD SHOUKAT's encrypted messages with Individual-1 included a screenshot of a messaging app chat that identified CC-1—using his first initial and last name—as SAAD SHOUKAT's source. SAAD SHOUKAT's messages also identified the same person—CC-1—as his source for other stock tips, including Immunomedics, Aimmune, Five Prime, and Adamas. SAAD SHOUKAT asked rhetorically, "Have I ever been wrong about deals?"

24. As discussed below, CC-1 had access to MNPI about pending deals for each of those four companies—Immunomedics, Aimmune, Five Prime, and Adamas. CC-1 shared this MNPI with SAAD SHOUKAT, as reflected in, among other things, SAAD SHOUKAT's admissions to Individual-1 about his "source" and the co-conspirators' trading patterns (discussed below). SAAD SHOUKAT and his co-conspirators, either alone or through others, made profitable trades ahead of public announcements for each deal.

**Immunomedics**

25. In or around April 2020, the U.S. Food and Drug Administration, or FDA, approved Immunomedics's new drug for the treatment of metastatic breast cancer. After months of subsequent negotiations, on or about September 14, 2020,

Gilead announced that it would acquire Immunomedics for $21 billion dollars. Gilead was a publicly traded biopharmaceutical company whose stock traded on NASDAQ, and Immunomedics was a biopharmaceutical company based in Morris Plains, New Jersey whose stock also traded on NASDAQ.

26. Before the deal's public announcement, CC-1 had access to MNPI, which CC-1 shared with SAAD SHOUKAT. SAAD SHOUKAT in turn tipped others who, along with SAAD SHOUKAT, bought Immunomedics securities. After the public announcement, SAAD SHOUKAT and others profited from their Immunomedics stock by over approximately $4.9 million.

27. The Investment Bank represented Gilead during the confidential negotiations leading up to the announcement. At least as early as on or about June 23, 2020, CC-1 had access to MNPI about the deal because he was on the Investment Bank's deal team.

28. Approximately one week later, on or about July 2, 2020, SAAD SHOUKAT and OKONKWO began buying shares of Immunomedics stock using online brokerage accounts in each of their names. Around the time when shares were purchased in OKONKWO's account, the account was accessed from both Atlanta, Georgia, where OKONKWO had relatives and spent time, and the United Kingdom, where SAAD SHOUKAT resided at the time. Around the same time, there were logins to SAAD SHOUKAT's account from the same IP address in the United Kingdom from which there were logins to OKONKWO's account.

29. On or about July 13, 2020, CC-1 received a document indicating that, during the week of on or about July 6, 2020, Gilead gained access to Immunomedics's data room so it could begin performing due diligence.

30. Between on or about July 13, 2020 and July 23, 2020, brokerage accounts in the names of SAAD SHOUKAT, Individual-2, OKONKWO, and Okonkwo Relative-1 began building equity positions in Immunomedics.

31. On or about August 5, 2020, CC-1 received documents related to the deal marked "Confidential," including a slide deck comparing the deal with other potential acquisition targets and an analysis of a potential partnership between Gilead and Immunomedics that contemplated an upfront payment of $1.75 billion, additional payments for meeting certain regulatory and commercial milestones, and royalty payments tied to sales volume.

32. Two days later, on or about August 7, 2020, brokerage accounts in the names of SAAD SHOUKAT, OKONKWO, and Okonkwo Relative-1 bought additional shares of Immunomedics.

33. On or about August 10, 2020, CC-1 received a copy of a confidential non-binding offer letter proposing a joint venture that Gilead sent Immunomedics. On or

about the same date, a screenshot of this letter was uploaded to a cloud storage account belonging to SAAD SHOUKAT, indicating that CC-1 illegally shared this MNPI with SAAD SHOUKAT.

34. From on or about August 14, 2020 through on or about August 21, 2020, brokerage accounts in the names of Individual-2 and OKONKWO bought additional shares of Immunomedics.

35. On or about August 26, 2020 OKONKWO told a friend, via an encrypted messaging application, "Bruh I sold everything and bought IMMU waiting." On or about September 8, 2020, OKONKWO added, "Im only in IMMU and [another stock]. And the pending data has IMMU maintaining itself[.]"

36. In or around early September 2020, CC-1 continued to receive information confirming that Gilead's acquisition of Immunomedics was imminent, including a draft offer letter from Gilead to Immunomedics proposing an acquisition of Immunomedics by Gilead for approximately $19.4 billion, which "represent[ed] a 94% premium to the closing price on September 9, 2020" and a valuation of "approximately $19.4 billion." The brokerage accounts for SAAD SHOUKAT, Individual-2, OKONKWO, and Okonkwo Relative-1 continued to maintain their equity positions in Immunomedics.

37. On or about September 13, 2020, Gilead announced that it would purchase Immunomedics for approximately $21 billion, or $88 per share. In the following days, the brokerage accounts for SAAD SHOUKAT, Individual-2, OKONKWO, and Okonkwo Relative-1 all closed out their positions in Immunomedics, profiting as indicated below:

| **Investor** | **Approximate Illegal Gains** |
|---|---|
| SAAD SHOUKAT | $1,917,270 |
| SHAHWAIZ SHOUKAT | $315,357 |
| OKONKWO | $2,278,906 |
| Okonkwo Relative-1 | $465,299 |
| Total | $4,976,832 |

**Aimmune**

38. On or about August 31, 2020, Nestlé announced that it would acquire Aimmune for $2.6 billion. Aimmune was a publicly traded biopharmaceutical company whose stock traded on NASDAQ.

39. The Investment Bank acted as Aimmune's financial advisor for this transaction. CC-1 was a member of the Investment Bank's deal team and had access to MNPI leading up to the Nestlé's acquisition, which CC-1 shared with SAAD SHOUKAT.

40. In or around May and June 2020, Aimmune, through the Investment Bank, began reaching out to other companies about entering a partnership or strategic transaction to commercialize its lead product—a peanut allergy treatment. Nestlé was among the companies that expressed interest, and at least as early as on or about July 9, 2020, CC-1 learned about a potential transaction.

41. On or about July 10, 2020, Nestlé had a call with Aimmune's board of directors and proposed discussing a potential acquisition of Aimmune at a price of $30 per share. At the time, Aimmune stock was trading at approximately $16 per share. From on or about July 10, 2020 through on or about August 29, 2020, Nestlé and Aimmune continued to discuss merger terms, which included increasing the per share price offer and exchanging draft merger agreements.

42. Beginning on or about August 19, 2020, before any public announcement, the Individual-2 brokerage account traded in Aimmune stocks and call options, and the Okonkwo Relative-1 brokerage account traded in Aimmune call options.

43. On or about August 31, 2020, a press release announced that Nestlé was acquiring Aimmune for $34.50 per share. On or about that same day, and after the public announcement, brokerage accounts in the names of Individual-2 and Okonkwo Relative-1 sold all of their Aimmune securities, profiting as follows:

| **Investor** | **Approximate Illegal Gains** |
|---|---|
| Individual-2 | $10,774 |
| Okonkwo Relative-1 | $109,056 |
| Total | $119,830 |

**Five Prime**

44. On or about March 4, 2021, Amgen announced that it would acquire Five Prime for $1.9 billion dollars. Five Prime and Amgen were both publicly traded biopharmaceutical companies whose stocks traded on NASDAQ.

45. Prior to merger discussions, Five Prime was developing a gastric cancer drug, and on or about November 10, 2020, Five Prime announced positive results from the Phase 2 trial for that drug. Shortly after the announcement, Five Prime retained the Investment Bank to help it develop the drug for distribution.

46. On or about January 27, 2021, another large healthcare company approached Five Prime with an unsolicited offer to buy it for $25 per share. At the time, Five Prime stock was trading at approximately $15 per share. On or about that same day, January 27, CC-1 was added to the deal team for Five Prime and had access to MNPI about the impending deal. CC-1 shared this MNPI with SAAD SHOUKAT.

47. On or about January 27, 2021—the same day CC-1 was added to the deal team—brokerage accounts in the names of Individual-2 and ARHAM SHOUKAT began building long positions in Five Prime stock. On or about January 28, 2020, brokerage accounts in the names of OKONKWO and Okonkwo Relative-1 began purchasing Five Prime shares.

48. From on or about January 27, 2021 through on or about March 3, 2021, Five Prime received additional bids for acquisition. During this time, brokerage accounts in the names of Individual-2, ARHAM SHOUKAT, OKONKWO, and Okonkwo Relative-1 continued to purchase Five Prime stock. On or about March 3, 2021, Five Prime's board of directors accepted Amgen's bid to acquire the company for $38 per share.

49. On or about March 4, 2021, Amgen announced that it would purchase Five Prime for approximately $1.9 billion or $38 per share. In the following days, brokerage accounts in the names of Individual-2, ARHAM SHOUKAT, OKONKWO, and Okonkwo Relative-1 closed out their positions in Five Prime, profiting as indicated below:

| **Investor** | **Approximate Illegal Gains** |
|---|---|
| Individual-2 | $586,561 |
| ARHAM SHOUKAT | $135,652 |
| OKONKWO | $165,737 |
| Okonkwo Relative-1 | $192,000 |
| Total | $1,079,950 |

**<u>Adamas</u>**

50. On or about October 11, 2021, Supernus announced that it would acquire Adamas for $400 million. Adamas and Supernus were both publicly traded pharmaceutical companies whose stock traded on NASDAQ.

51. From in or around October 2020 through in or around March 2021, Adamas received several unsolicited purchase bids, which Adamas rejected. The Investment Bank had an ongoing relationship with Adamas and had helped it evaluate unsolicited bids. In or around January 2021, using an internal messaging platform, one of CC-1's colleagues told him about one of the unsolicited Adamas bids. In or around early May 2021, that same colleague, along with CC-1's boss, were asked to prepare a presentation about Adamas's valuation in connection with a potential Supernus transaction.

52. On or about May 12, 2021, one or more brokerage accounts in ARHAM SHOUKAT's name began purchasing Adamas stock, and, on or about May 14, 2021,

one or more brokerage accounts in SAAD SHOUKAT's name also began buying Adamas stock.

53. On or about June 30, 2021, Supernus offered to purchase Adamas for $8 per share. In or around early July 2021, one or more brokerage accounts in ARHAM SHOUKAT's name significantly increased its purchasing of Adamas stock, and on or about July 8, 2021, one or more brokerage accounts in Individual-2's name also began buying Adamas securities.

54. From on or about July 22, 2021 through on or about October 9, 2021, Adamas engaged in negotiations with Supernus and a second potential buyer. During the transaction negotiations, CC-1 had periodic conversations with colleagues, on the Investment Bank's internal messaging application, about the Adamas transaction. During this period, brokerage accounts in the names of ARHAM SHOUKAT and Individual-2 continued to build their positions in Adamas stock.

55. On or about October 11, 2021, Supernus and Adamas announced that Supernus had agreed to purchase Adamas for $8.10 per share, approximately a 76% premium over the closing per share price on October 8, 2021. In the following days, brokerage accounts in the names of ARHAM SHOUKAT and Individual-2 closed out their positions in Adamas, profiting as follows:

| **Investor** | **Approximate Illegal Gains** |
|---|---|
| Individual-2 | $837,781 |
| ARHAM SHOUKAT | $193,728 |
| Total | $1,031,509 |

**Sierra, GBT, Oak Street, Reata, ImmunoGen**

56. CC-1 also received MNPI about the five additional companies listed in Chart 1 and Chart 2: Sierra, GBT, Oak Street, Reata, and ImmunoGen. As with the previous deals, CC-1 shared that MNPI with SAAD SHOUKAT who tipped it to others including ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, KHAN, and OKONKWO, resulting in substantial insider trading profits.

**Sierra**

57. On or about April 13, 2022, GSK announced that it would acquire Sierra for $1.9 billion or $55 per share. Sierra was a biopharmaceutical company whose stock traded on NASDAQ.

58. Sierra retained the Investment Bank as its financial advisor for the transaction. CC-1 was not on the deal team, but he knew about the potential transaction at least as early as March 11, 2022. On or about March 11, 2022, CC-1 sent a message to a colleague, using a messaging platform, saying, "We need a deallllll

Give us deallllllssssss," to which the colleague responded, "Sierra should be the closest [right now]." On or about the same day, GSK offered to purchase Sierra for $51 per share.

59. On or about March 11, 2022, a Friday, one or more brokerage accounts in Individual-2's name began building a long position in Sierra. On or about March 14, 2022, the following Monday, brokerage accounts in the names of SAAD SHOUKAT, ARHAM SHOUKAT, and OKONKWO began buying Sierra stock.

60. On or about March 24, 2022, SHAHWAIZ SHOUKAT wrote to ARHAM SHOUKAT, using an encrypted messaging app, asking if ARHAM SHOUKAT had seen a message from SAAD SHOUKAT on another encrypted messaging platform, in which SAAD SHOUKAT said "he wants to put it all into options[.] srra . . . lol." In the following weeks, one or more brokerage accounts in SAAD SHOUKAT's name began selling Sierra stock and buying Sierra call options.

61. On or about April 2, 2022, GSK increased its offer to buy Sierra to $55 per share and expressed a desire to reach an agreement quickly. One or more brokerage accounts in KHAN's name began purchasing call options in Sierra on or about the same day. On or about April 7, 2022, one or more brokerage accounts in Okonkwo Relative-1's name started buying Sierra call options.

62. On or about April 13, 2022, Sierra and GSK announced that GKS would acquire Sierra for $1.9 billion, or $55.00 per share.

63. Starting on or about April 13, 2022, brokerage accounts in names of SAAD SHOUKAT, Individual-2, OKONKWO, KHAN, ARHAM SHOUKAT, and Okonkwo Relative-1, all began closing out their positions in Sierra, profiting as indicated below:

| **Investor** | **Approximate Illegal Gain** |
|---|---|
| SAAD SHOUKAT | $1,030,973 |
| Individual-2 | $427,229 |
| OKONKWO | $370,391 |
| KHAN | $334,850 |
| ARHAM SHOUKAT | $195,142 |
| Okonkwo Relative-1 | $41,238 |
| Total | $2,399,823 |

**<u>GBT</u>**

64. On or about August 8, 2022, Pfizer announced that it would acquire GBT for $5.4 billion or $68 per share. GBT and Pfizer were both publicly traded pharmaceutical companies whose stock traded on NASDAQ and the NYSE, respectively.

65. The Investment Bank represented Company-1, a pharmaceutical company headquartered in New Jersey, which approached GBT in or around late May 2022 about a potential acquisition. Before that, on or about April 27, 2022, CC-1 prepared a detailed financial analysis of GBT.

66. On or about May 17, 2022, SAAD SHOUKAT traveled to San Francisco, where CC-1 was living at the time. SAAD SHOUKAT saw OKONKWO on the same visit.

67. Brokerage accounts in the names of OKONWKO and Okonkwo Relative-1 began buying shares and call options of GBT in or around late May 2022.

68. On or about June 6, 2022, Company-1 offered to acquire GBT for $55 per share. At the time, GBT stock was trading at approximately $26.11 per share.

69. ARHAM SHOUKAT and SHAHWAIZ SHOUKAT discussed the potential acquisition of GBT on an encrypted messaging platform on or about June 27, 2022.

70. On or about June 29, 2022, Company-1 increased its offer to $60 per share. Then on or about July 1, 2022, SHAHWAIZ SHOUKAT wrote, "GBT" "Apparently something." ARHAM SHOUKAT wrote back, "yeah."

71. Around the same time SAAD SHOUKAT and others were trading as follows:

a. One or more brokerage accounts in Individual-2's name began buying GBT stock on or about June 24, 2022 and GBT call options on or about July 1, 2022.

b. One or more brokerage accounts in ARHAM SHOUKAT's name began buying GBT call options on or about June 28, 2022 and began buying GBT stock on or about July 8, 2022.

c. One or more brokerage accounts in SAAD SHOUKAT's name began placing positive bets on GBT with spread betting firms on or about June 28, 2022.

72. On or about July 11, 2022, KHAN began placing positive bets on GBT with spread betting firms.

73. On or about July 11, 2022, Pfizer offered to buy GBT for $53 per share and, on or about July 12, 2022, another potential buyer, offered to buy GBT for $50.50 per share.

74. On or about that same day, July 12, ARHAM SHOUKAT wrote to SHAHWAIZ SHOUKAT using an encrypted app, "I think gbt might happen next week." On or about the next day, July 13, 2022, ARHAM SHOUKAT wrote, "one I know gbt[,] just gonna go all in options. SHAHWAIZ SHOUKAT responded, "Yeah" "This will happen," and ARHAM SHOUKAT replied, "offers at 60."

75. On July 15, 2022, CC-1 sent SAAD SHOUKAT, using an encrypted messaging app, a photo of a confidential Investment Bank document entitled "Script and Q&A, Talking Points." The document, which SAAD SHOUKAT shared with SHAHWAIZ SHOUKAT, discussed the $60 per share offer and stated that Company-1 would like to announce a transaction before the end of the month.

76. On July 18, 2022, SAAD SHOUKAT asked one of the UK-based spread betting firms that he was using to invest in GBT to decrease his margin requirement so he could "take a large position going into [GBT's] earnings," and he added that he was "prepared to deposit 200k more." The spread betting firm denied the request.

77. On or about July 18, 2022, ARHAM SHOUKAT wrote to SHAHWAIZ SHOUKAT on an encrypted app, "no update on gbt" "I think tomz [i.e., tomorrow]."

78. On or about July 20, 2022, CC-1 sent an encrypted message to SAAD SHOUKAT with a photo of a letter from GBT's auditor, which asked GBT to give an accounting firm and Company-1 access to its workpapers. CC-1 wrote, "They hired [the accounting firm]. I've never seen this. Before even announcement." SAAD SHOUKAT shared this MNPI with SHAHWAIZ SHOUKAT.

79. Around the same time, SAAD SHOUKAT shared additional MNPI with his co-conspirators using an encrypted messaging group chat titled "London 2022" that included SAAD SHOUKAT, SHAHWAIZ SHOUKAT, ARHAM SHOUKAT, and KHAN. SAAD SHOUKAT wrote:




80. On or about August 3, 2022, a financial news organization reported that GBT had drawn takeover interest from large pharmaceutical companies, but did not name those companies. This article led to a substantial increase in GBT's stock price.

81. Subsequent to that news report, KHAN wrote to his wife using an encrypted messaging app, "Deal leaked"; "It's all over [social media]"; and "GBT" "Is at 44." KHAN's wife asked if this news was bad or good, to which KHAN replied, "Deal will be at 62.5[,] But wtf why has it leaked," and "This is stupid." KHAN then instructed, "Delete this chat," to which his wife replied, "probably saad."

82. On or about August 5, 2022, Company-1 and Pfizer both submitted best and last offers, and a second financial news organization reported that Pfizer was in "advanced talks to buy [GBT]" for $5 billion, leading to another increase in GBT's stock price.

83. On or about August 5, 2022, the brokerage accounts in the names of KHAN, SAAD SHOUKAT, SHAHWAIZ SHOUKAT, OKONKWO, Okonkwo Relative-1, ARHAM SHOUKAT, and Individual-2 all closed out their positions in GBT, profiting as follows:

| Investor | Approximate Illegal Gains |
|---|---|
| KHAN | $5,632,005 |
| SAAD SHOUKAT | $5,169,091 |
| SHAHWAIZ SHOUKAT | $4,912,626 |
| OKONKWO | $3,463,568 |
| Okonkwo Relative-1 | $617,727 |
| ARHAM SHOUKAT | $412,033 |
| Individual-2 | $17,494 |
| Total | $20,224,544 |

84. On or about that same day, August 5, ARHAM SHOUKAT and KHAN exchanged the following messages using an encrypted messaging app:

a. Referring to SAAD SHOUKAT, ARHAM SHOUKAT wrote, “hes on a high,” “I told him he needs to pay his us taxes[,] get his shit in order[,] money in the bank can only do so much.”

b. ARHAM SHOUKAT continued, “we need to tell him [SAAD SHOUKAT] great we made money but ab things need to change[.] [CC-1’s initials] cannot be a source of income.”

c. KHAN responded, “We will have a chat with him [SAAD SHOUKAT] again tomorrow” and “Bro… after this if you still need a source and have to beg someone then it’s not worth it.”

d. KHAN wrote that SAAD SHOUKAT had made “5m£”—meaning £5 million. ARHAM SHOUKAT responded, “he should put it to good use.” KHAN replied, “Now pay taxes and live an easy life.”

85. On or about August 8, 2022, Pfizer and GBT announced that Pfizer would acquire GBT for $5.4 billion, or $68.50 per share.

86. On or about that same day, ARHAM SHOUKAT wrote to KHAN using an encrypted messaging app, “ive cleared all chats etc.” KHAN replied, “Perfect I’ll chase them tomorrow.”

87. Later that month, on or about August 24, 2022, ARHAM SHOUKAT and SHAHWAIZ SHOUKAT were discussing SAAD SHOUKAT’s trading activity using an encrypted messaging app. ARHAM SHOUKAT wrote, “I know he has two three buyouts,” and “the day gbt rumor came out [CC-1’s initials] told him [SAAD SHOUKAT] two three.”

**Oak Street**

88. On or about February 8, 2023, CVS announced that it was acquiring Oak Street for approximately $10.6 billion or $39 per share. Oak Street was a health care company whose stock traded on the NYSE.

89. CC-1 was not on the deal team, but his colleagues at the Investment Bank acted as CVS's financial advisor for this transaction.

90. On or about November 7, 2022, representatives of CVS told representatives of Oak Street that CVS was prepared to offer $28.00 per share to acquire Oak Street. At the time, Oak Street stock was trading at approximately $21 per share.

91. On or about November 14, 2022 and November 15, 2022, brokerage accounts in the names of SAAD SHOUKAT and KHAN began placing positive bets on Oak Street with spread betting firms.

92. On or about December 22, 2022, CVS offered to acquire Oak Street for $41 per share.

93. On or about December 23, 2022, one or more brokerage accounts in the name of ARHAM SHOUKAT began purchasing Oak Street stock, and spread betting accounts in the name of AHRAM's wife began placing positive spread bets on Oak Street.

94. Also on or about December 23, 2022, brokerage accounts in the names of SAAD SHOUKAT and KHAN began placing larger and more frequent spread bets on Oak Street.

95. On or about December 27, 2022, SAAD SHOUKAT and ARHAM SHOUKAT, using an encrypted messaging app, exchanged the following messages:

| | |
|---|---|
| SAAD SHOUKAT | OSH |
| ARHAM SHOUKAT | osh kosh? |
| SAAD SHOUKAT: | Keep it to yourself |
| SAAD SHOUKAT | Lol nai[2] |
| ARHAM SHOUKAT | deal? |

[2] "Nai" is the Urdu word for "no."

| | |
|---|---|
| SAAD SHOUKAT | Oak street |
| AHRAM | nicee |
| SAAD SHOUKAT | 40 offer hey[3] |
| SAAD SHOUKAT | Stock 20 |
| ARHAM SHOUKAT | Damnnn |
| ARHAM SHOUKAT | Q1? |
| SAAD SHOUKAT | Yeah end Jan |

96. On or about January 6, 2023, one or more brokerage accounts in ARHAM SHOUKAT's name bought Oak Street call options.

97. On or about January 9, 2023, one or more brokerage accounts in SHAHWAIZ SHOUKAT's name also began buying Oak Street call options.

98. On or about January 9, 2023, after market hours, a financial news organization published an article saying that CVS was pursuing an acquisition of Oak Street. The article indicated that the impending transaction was based on a valuation of Oak Street that exceeded $10 billion.

99. Starting on or January 10, 2023 and brokerage accounts in the names of SAAD SHOUKAT, KHAN, ARHAM SHOUKAT, ARHAM SHOUKAT's wife, and SHAHWAIZ SHOUKAT, all began closing out their positions in Oak Street, profiting as follows:

| **Investor** | **Approximate Illegal Gains** |
|---|---|
| SAAD SHOUKAT | $2,264,569 |
| ARHAM SHOUKAT | $149,035 |
| SHAHWAIZ SHOUKAT | $109,415 |
| KHAN | $104,639 |
| Total | $2,627,658 |

100. On or about February 28, 2023, ARHAM SHOUKAT and SHAHWAIZ SHOUKAT used an encrypted messaging app to discuss how much profit they netted from "osh."

101. Similarly, on or about March 1, 2023, SAAD SHOUKAT and KHAN communicated using an encrypted messaging app to discuss their Oak Street trading.

[3] "Hey" is the Urdu work for "is."

SAAD SHOUKAT asked, "What was the total profit on OSH?" They then discussed those profits and the spread betting platforms they used to make trades. Addressing how KHAN would pay SAAD SHOUKAT his percentage of the profits from KHAN's trading, SAAD SHOUKAT wrote, "Better to just settle on the go. Instead of large transfers."

**Reata**

102. On or about July 28, 2023, Biogen announced that it was acquiring Reata for approximately $7.3 billion or $172.50 per share. Reata was a pharmaceutical company whose stock traded on NASDAQ.

103. The Investment Bank acted as Biogen's financial advisor for this transaction. While CC-1 was not a member of the Investment Bank's deal team, his boss learned about the potential transaction on or about June 16, 2023. The Investment Bank referred to the potential transaction by the confidential codename "River." As demonstrated below, CC-1 obtained MNPI about this deal and shared it with SAAD SHOUKAT who then tipped others.

104. On or about June 23, 2023, a week after CC-1's boss became aware of the potential transaction, brokerage accounts in the names of OKONKWO, ARHAM SHOUKAT, and SHAHWAIZ began building equity positions in Reata stock.

105. On or about July 6, 2023, SAAD SHOUKAT and OKONKWO exchanged the following messages using an encrypted messaging app:

| | |
|---|---|
| SAAD SHOUKAT | Bro |
| SAAD SHOUKAT | Fuck |
| SAAD SHOUKAT | R [Reata] |
| SAAD SHOUKAT | Is flying |
| OKONKWO | 108? |
| SAAD SHOUKAT | Yeah |
| SAAD SHOUKAT | Deal won't be above 150 |
| SAAD SHOUKAT | Those bastards always knows |
| SAAD SHOUKAT | Let's see |
| OKONKWO | There's a deal!?! |
| SAAD SHOUKAT | Potentially |
| OKONKWO | Haha you never said 😂 😂 |
| SAAD SHOUKAT | But last I knew it was being prepared |
| SAAD SHOUKAT | An offer |
| SAAD SHOUKAT | Over the weekend |
| OKONKWO | I'm not trading so it's whatever |
| SAAD SHOUKAT | Yeah fair |

106. On or about July 9, 2023, SAAD SHOUKAT and CC-1, using an encrypted messaging app, discussed the "River" deal and SAAD SHOUKAT's ongoing efforts to help CC-1 secure a job at a different investment bank ("Investment Bank-2"):

| | |
|---|---|
| CC-1 | Imagine if river works out |
| SAAD SHOUKAT | Bro |
| SAAD SHOUKAT | UFFFFFFF |
| SAAD SHOUKAT | That would be the boom bang |
| SAAD SHOUKAT | My boys on it |
| SAAD SHOUKAT | Lol it's 10k as well |
| SAAD SHOUKAT | Key thing though |
| SAAD SHOUKAT | Getting you [Investment Bank-2] |

107. On or about July 14, 2023, Biogen offered to buy Reata for $150 per share. On or about July 27, 2023, Biogen submitted a revised offer to buy Reata for $172.50 per share.

108. Also on or about July 27, 2023, a website that publishes financial rumors reported "takeover speculation" concerning Reata (the "Reata Leak").

109. On or about that same day, July 27, SHAHWAIZ SHOUKAT and ARHAM SHOUKAT, using an encrypted messaging app, exchanged messages about the Reata Leak:

| | |
|---|---|
| ARHAM SHOUKAT | didnt move it at all |
| SHAHWAIZ SHOUKAT | Lol |
| SHAHWAIZ SHOUKAT | He's frustrated |
| SHAHWAIZ SHOUKAT | I don't get why he has to make it even riskier |
| SHAHWAIZ SHOUKAT | Payoffs not there |

110. On or about July 28, 2023, Reata and Biogen announced the deal in a joint pre-market press release.

111. Starting on or about July 28, 2023, brokerage accounts in the names of OKONKWO, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, Okonkwo Relative-1, and Individual-2 began closing out their positions in Reata, profiting as indicated below:

| Investor | Approximate Illegal Gains |
|---|---|
| OKONKWO | $4,713,177 |
| ARHAM SHOUKAT | $406,790 |
| SHAHWAIZ SHOUKAT | $259,684 |
| Okonkwo Relative-1 | $200,450 |
| Individual-2 | $9,455 |
| Total | $5,589,556 |

**ImmunoGen**

112. On or about November 30, 2023, AbbVie announced that it was acquiring Immunogen for approximately $10.1 billion or $31.20 per share. Immunogen was a pharmaceutical company whose stock traded on Nasdaq. The Investment Bank acted as one of ImmunoGen's financial advisors for this transaction. CC-1 learned about the potential transaction on or about April 26, 2023. The Investment Bank referred to the potential transaction by the codename "Project Ibiza."

113. On or about April 25, 2023, a third company ("Company-2") approached ImmunoGen about a potential transaction and, on or about April 26, 2023 sent a non-binding indication of interest.

114. On or about April 26, 2023, CC-1 sent SAAD SHOUKAT a message, using an encrypted messaging app, identifying ImmunoGen by its stock ticker, IMGN, and saying, "Get ready bro. Shit is about to pop off."

115. On or about April 27, 2023, brokerage accounts in the names of ARHAM SHOUKAT, OKONKWO, and Okonkwo Relative-1 started investing in ImmunoGen.

116. On or about May 15, 2023, CC-1 sent an email to colleagues at the Investment Bank and representatives of ImmunoGen's other financial advisor, attaching presentation slides with revised financial forecasts for ImmunoGen (the "Ibiza Deck").

117. On or about May 16, 2023, SHAHWAIZ SHOUKAT and ARHAM SHOUKAT, using an encrypted messaging app, exchanged text messages about the Ibiza Deck. SHAHWAIZ SHOUKAT asked, "Did you see the stuff from saad . . . Screenshot?" ARHAM SHOUKAT replied, "he has some stuff . . . just the deck they prepared."

118. On or about May 20, 2023, during a video conference between representatives of ImmunoGen and Company-2, the companies agreed that they had come to an impasse and agreed to end their negotiations.

119. On or about May 24, 2023, SHAHWAIZ SHOUKAT sent himself an email attaching a picture of computer screen displaying the Investment Bank's "Overview of Key Workstreams," a list of tasks related to Project Ibiza.

120. On or about June 16, 2023, SAAD SHOUKAT sent CC-1 a message, using an encrypted messaging app, saying "I'm sad Ibiza is dead. Was gonna be it. For you." CC-1 replied, "Still not down for the count. But yeah extends the pain." SAAD SHOUKAT responded, "Needs to be some insider transactions."

121. On or about June 20, 2023, SAAD SHOUKAT sent CC-1 a message, using an encrypted messaging app, saying, "Dude, If I get you [Investment Bank-2] I will consider my life achievement." CC-1 responded, "Haha. If I can help you get fuck you money status. That will be mine." Later in the same conversation, CC-1 told SAAD SHOUKAT that he was resigning from the Investment Bank, and SAAD SHOUKAT tried to convince CC-1 to offer to continue working on deals like ImmunoGen:

| | |
|---|---|
| CC-1 | I have my resignation call with [CC-1's boss] right now. |
| | . . . . |
| SAAD SHOUKAT | Offer to continue the deals if they move. So you can see them out. |
| | . . . . |
| CC-1 | Nah I don't want to offer that. That's too painful at this point. |
| SAAD SHOUKAT | Fair. But I need visibility 😂. On I [i.e., Ibiza] for a bit. Cuz im short. 😂😂😂😂 |
| CC-1 | You have until July 31st |

122. On or about July 9, 2023, SAAD SHOUKAT, using an encrypted messaging app, asked CC-1, in substance, to continue working at the Investment Bank, and, in exchange, SAAD SHOUKAT wrote, "I'll get you the watch," referring to a specific model of Rolex watch.

123. CC-1's last day working at the Investment Bank was on or about July 31, 2023.

124. On or about November 30, 2023, AbbVie and ImmunoGen announced that AbbVie would acquire ImmunoGen. Starting before that public announcement, on or about November 20, 2023, and ending on or about February 8, 2024, brokerage accounts in the names of OKONKWO, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, and Okonkwo Relative-1 closed out their positions in ImmunoGen. They profited as follows:

| Investor | Approximate Illegal Gains |
|---|---|
| OKONKWO | $2,930,056 |
| ARHAM SHOUKAT | $101,230 |
| Okonkwo Relative-1 | $95,972 |
| Individual-2 | $19,016 |
| Total | $3,146,274 |

* * *

125. Over the course of the Insider Trading Scheme, the insider trading profits of SAAD SHOUKAT, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, OKONKWO, and KHAN combined to total at least $41 million.

## THE MARKET MANIPULATION SCHEMES

126. During the Insider Trading Scheme, SAAD SHOUKAT and others tried at times to identify stocks to trade in without MNPI from CC-1. Olema was one of those stocks. Instead of trying to profit from those trades in Olema legally, SAAD SHOUKAT, ARHAM SHOUKAT, and others used various techniques, including hacking, to obtain MNPI about Olema and artificially pump up Olema's stock price. After successfully doing so, SAAD SHOUKAT, ARHAM SHOUKAT, and others profited and/or avoided losses by selling Olema shares.

127. SAAD SHOUKAT and others began investing in Opiant based on MNPI that SAAD SHOUKAT received from CC-1 about a potential deal involving Opiant and another company. But once that deal fizzled, SAAD SHOUKAT, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT, and others used various techniques, including hacking and spoofing, to profit and/or avoid losses by artificially pumping up Opiant's stock price.

128. The subsections below describe each scheme.

### The Olema Manipulation Scheme

#### SAAD SHOUKAT and ARHAM SHOUKAT start buying Olema stock

129. Olema was developing a breast cancer drug, called OP-1250, and conducting clinical trials to determine OP-1250's effectiveness.

130. On or about May 11, 2021, Olema issued its Q1 earnings and announced in a press release that it anticipated releasing "initial clinical data" about the OP-1250 trials in or around the second half of 2021.

131. On or about the next day, May 12, 2021, one or more brokerage accounts in SAAD SHOUKAT's name bought Olema stock. In or around August 2021, one or

more brokerage accounts in ARHAM SHOUKAT's name also began buying Olema stock.

**SAAD SHOUKAT Seeks MNPI about Olema**

132. Beginning in or around July 2021, SAAD SHOUKAT and ARHAM SHOUKAT, working together and with others, used several methods to try to get non-public inside information about Olema and the OP-1250 clinical trials.

133. First, SAAD SHOUKAT tried to get information from Olema's leadership. For example, in or around July 2021, SAAD SHOUKAT emailed an Olema board member asking for an introduction to Olema's management. In or around August 2021, SAAD SHOUKAT followed up by email, "[W]hat's your benchmark for good data at sabcs? Particularly when it comes to efficacy and nausea etc." The Olema board member responded, "Saad – we are on the board, so I obviously cant comment on these things."

134. During the same period, SAAD SHOUKAT, working together and with others, tried to get inside information about OP-1250 by impersonating doctors. An email account that SAAD SHOUKAT routinely used (the "SAAD Email Account") in his own name was linked by internet cookies[4] to three email accounts that purported to be used by real doctors at medical centers but were actually fake accounts used to try to obtain confidential information about OP-1250. For example:

a. One of the fake email accounts linked to the SAAD Email Account ("Fake Email-1") contained the name of a real medical center in Buffalo, New York and closely mirrored the real domain name for that medical center. In or around September 2021, Fake Email-1 emailed an Olema clinical trial site seeking "the consent and protocol documents for the OP-1250 study," and asked about, among other things, "toxicities . . . including fatigue, nausea, tremors, and . . . bradycardia."

b. Another fake email account linked to the SAAD Email Account ("Fake Email-2") contained the name of another real medical centner and was almost identical to its real domain name. In or around early November 2021, Fake Email-2 attempted to get information about OP-1250 by claiming to have a Pakistani patient named "Shahida" admitted into the OP-1250 clinical trial.

135. These efforts succeeded to a certain extent and allowed SAAD SHOUKAT and others to obtain non-public data about ongoing OP-1250 results.

---

[4] When an internet user visits a website, including to access email accounts, unique digital identifiers, known as cookies, are placed on the user's computer or cell phone to track the user's internet activity on that device.

**SAAD SHOUKAT and ARHAM SHOUKAT Increase Their Olema Positions**

136. In or around October 2021, one or more brokerage accounts in SAAD SHOUKAT's name began buying Olema call options. By in or around mid-November 2021, one or more brokerage accounts in SAAD SHOUKAT's name held approximately 422,709 shares of Olema stock and approximately 359 call options.

137. ARHAM SHOUKAT also began buying Olema call options in or around October 2021. By in around mid-November 2021, ARHAM SHOUKAT held approximately 20,213 shares of Olema stock and approximately 2,416 Olema call options.

**The Fake Poster**

138. On or about November 10, 2021, Olema announced in a press release that it planned to release the results of the OP-1250 clinical trials during an industry conference (the "Conference"). At the Conference, Olema and other companies were expected to present and disseminate their results through a detailed poster. Typically, pharmaceutical companies displayed physical posters, on poster board, during such conferences. But because the Conference occurred during the COVID-19 pandemic, companies, including Olema, were instead asked to provide electronic posters.

139. In or around the same time, SAAD SHOUKAT and ARHAM SHOUKAT obtained a copy of Olema's non-public poster for the Conference. They determined that the OP-1250 data in the poster were less promising than they had hoped, which might negatively affect the stock price once disclosed to the public.

140. SAAD SHOUKAT and ARHAM SHOUKAT decided to falsify the data on the poster to inflate OP-1250's efficacy and understate its adverse effects (the "Fake Poster"). Presuming that these false data would artificially pump up Olema's stock, SAAD SHOUKAT and ARHAM SHOUKAT could then sell their shares while Olema's stock price was artificially inflated.

141. ARHAM SHOUKAT, working with computer hackers in Pakistan, took over the account on a breast cancer forum of a breast cancer patient who had previously posted messages on the forum about participating in the OP-1250 study (the "Stolen Account").

142. On or about November 28, 2021, ARHAM SHOUKAT, on his own and with others, posted the Fake Poster on the breast cancer forum using the Stolen Account. Shortly after ARHAM SHOUKAT posted the Fake Poster using the Stolen Account, the post was removed from the breast cancer forum and the Stolen Account was restored to its owner.

**The Scheme's Profits and Losses**

143. On or about the next day, November 29, 2021, the Fake Poster was distributed widely over social media, which caused a temporary spike in Olema's stock price. SAAD SHOUKAT and ARHAM SHOUKAT profited off that volatility, as follows:

a. Olema's stock opened that day at approximately $21.47 per share, and approximately 2,600 shares were being traded at or near opening.

b. Soon after news about the Fake Poster spread on social media, Olema's stock price increased approximately 15% with approximately 240,000 shares being traded.

c. NASDAQ briefly paused trading on Olema and then reopened it at approximately 3:00 p.m. ET.

d. After trading resumed, the Olema trading volume substantially increased and, from approximately 3:00 to 3:25 p.m. ET, the stock fluctuated between approximately $21.00 and $26.00 per share.

e. From approximately 2:49 p.m. ET and 3:22 p.m. ET, trading accounts in the names of SAAD SHOUKAT and ARHAM SHOUKAT each sold a high percentage of their Olema shares, and ARHAM SHOUKAT sold many of his options, each profiting as follows:

| Defendant | Approx. % of Shares Sold | Approx. % of Options Sold | Benefit from Artificial Price Inflation |
|---|---|---|---|
| SAAD SHOUKAT | 23% | | $182,408 |
| ARHAM SHOUKAT | 41% | 38% | $75,554 |
| Total | | | $257,962 |

144. On or about November 30, 2021, Olema publicly disclosed the real clinical data and a real version of its poster for the Conference. Olema's stock price fell dramatically, closing that day at approximately $8.75 per share.

145. The Olema Manipulation Scheme caused substantial losses to investors, including investors in New Jersey.

## Opiant Manipulation Scheme

### Summary of the Scheme

146. Opiant was a pharmaceutical company headquartered in Santa Monica, California. On or about November 4, 2021, the FDA granted fast track designation to OPNT003, a nasal spray Opiant was developing to treat opioid overdoses. Around the same time, Opiant publicly announced, among other things, that it was planning to release new data in or around early 2022 and hoped to begin commercial distribution of OPNT003 by in or around the end of 2022.

147. In or around October 2021, Opiant began non-public discussions with Company-3, a pharmaceutical company headquartered in Virginia, about a possible merger. Company-3 sent Opiant an initial offer letter of $35 per share on or about October 15, 2021. The two companies continued merger discussions through on or about February 6, 2022, with Company-3 increasing its offer to $40 per share.

148. The Investment Bank—where CC-1 worked—became involved in the deal in or around late October and early November 2021. CC-1 learned about the potential Opiant deal as early as on or about October 28, 2021, when he was part of a messaging platform discussion at the Investment Bank about representing Opiant in a potential deal.

149. In or around early December 2021—soon after CC-1 gained access to MNPI about the possible Opiant deal—SAAD SHOUKAT, ARHAM SHOUKAT, SHAHWAIZ SHOUKAT (using trading accounts in Individual-2's name), and KAHN, began buying a large volume of Opiant stock.

150. In or around December 2021 and January 2022, SAAD SHOUKAT began pushing Individual-1 to purchase Opiant securities to offset his Olema losses. In an encrypted messaging app exchange with Individual-1, SAAD SHOUKAT, as discussed above, identified CC-1 by his first initial and last name as his source for the Opiant deal and described CC-1 as "Banker. Friend. Source for all deals."

151. SAAD SHOUKAT also relayed specific MNPI about the potential deal to Individual-1. He provided Individual-1 the name of Company-3 as the potential acquirer. And SAAD SHOUKAT wrote, "Spoke to my boy [i.e., CC-1] today," "[s]aying final phase," and "[e]xpecting close early feb."

152. However, soon after in or around mid-February 2022, negotiations between Opiant and Company-3 stalled, and the deal was abandoned. The collapse of that deal was not made public. But it left the SHOUKATS holding a large position in Opiant, without any real prospects of recouping their investments.

153. The SHOUKATS and others then attempted to drive up Opiant's stock price by pressuring Opiant into prematurely releasing information about the OPNT003 study. That pressure campaign was unsuccessful.

154. In addition, the SHOUKATS, working together and with others, used hacking and other illicit techniques to manipulate the Opiant stock price on their own. Using a server (the "Shoukat Server") that ARHAM SHOUKAT paid for with his credit card, the SHOUKATS, working together and with others, created a fake and fraudulent internet domain and website opiant.co.uk, that resembled, but was different from Opiant's real internet domain and website, opiant.com. And they used that fake domain to create fake and fraudulent email addresses that resembled real email addresses of members of Opiant's leadership team.

155. The SHOUKATS, working together and with others, also created a false press release (the "False Release"), which they caused to be publicly disseminated. That False Release falsely and fraudulently announced a business deal between Opiant and a U.K.- based pharmaceutical company ("Company-4"). In reality, no such deal existed. Nonetheless, the announcement caused the price of Opiant's shares to increase, at which point the SHOUKATS and others traded in Opiant shares and avoided losses.

**The Pressure Campaign**

156. In or around January through March 2022, SHAHWAIZ SHOUKAT and SAAD SHOUKAT sent Opiant representatives multiple emails in which, among other things, they complained about supposed delays in releasing information about Opiant's product and sought an audience with Opiant executives. SHAHWAIZ SHOUKAT introduced himself as running a "family office which has taken a sizeable position in OPNT." SAAD SHOUKAT described himself as a consultant for a California-based healthcare investment firm and "one of the largest private shareholder[s] of Opiant," controlling approximately 225,000 shares.

157. On or about March 15, 2022, Opiant publicly announced delays in releasing certain study data and OPNT003's potential commercial launch. On or about the next day, SAAD SHOUKAT asked for and was granted an opportunity to participate in a video conference with Opiant executives. During the video conference, SAAD SHOUKAT—using his real name and appearing on screen—asked about OPNT003 and when certain data would be released. In a subsequent email, SAAD SHOUKAT asked Opiant to facilitate the private sale of some of his Opiant shares. That request was denied.

158. In or around April 2022, as part of their pressure campaign, SAAD SHOUKAT sent multiple emails to a NASDAQ investigations team asking them to open an investigation into Opiant, and SAAD SHOUKAT copied Opiant executives on many of these emails.

159. During the same period, the SHOUKATS used social media to post about Opiant. For example:

a. On or about March 21, 2022, after expressing frustration that an Opiant deal hadn't closed yet, ARHAM SHOUKAT wrote to SHAHWAIZ SHOUKAT using an encrypted messaging app, "leaking it." On or about the next day, March 22, ARHAM SHOUKAT and SHAHWAIZ SHOUKAT discussed posting a "snipped" version of a purported offer letter to acquire Opiant on social media and tagging Opiant using a "fake" social media handle.

b. On or about that same day, ARHAM SHOUKAT uploaded part of that purported offer letter onto a web-based social media platform using an anonymous social media account.

160. On or about March 24, 2022, SHAHWAIZ SHOUKAT wrote to ARHAM SHOUKAT using an encrypted messaging app, "This stock so easily manipulated." ARHAM SHOUKAT responded, "yup" and "that we always knew."

161. From on or about March 24 to on or about March 28, 2022, ARHAM SHOUKAT used the social media handle "@OpntD" to post approximately 10 times about Opiant. These posts included references to a $40 offer, specifically referenced Company-3, and contained specific threats to Opiant's CEO.

162. On or about April 6, 2022, ARHAM SHOUKAT told SHAHWAIZ SHOUKAT that he "spoke to saad," and SHAHWAIZ SHOUKAT responded by sending a link to a fake Opiant-related social media account. SHAHWAIZ SHOUKAT asked, "Can you get this verified? If so maybe we have a shot at pumping this dog."

**The Fake and Fraudulent Domain, Website, and Email Accounts**

163. As part of the scheme to manipulate Opiant's stock price, the SHOUKATS, working together and with others, created a fake and fraudulent Opiant website, domain name, and email accounts.

164. As noted above, Opiant's real domain was opiant.com, and Opiant's actual employees used email addresses ending in @opiant.com. The SHOUKATS directed the creation of two fake domains to mirror, or "spoof," Opiant's actual, legitimate domain.

165. Specifically, on or about January 21, 2022, ARHAM SHOUKAT communicated using an encrypted messaging app with a Pakistan-based computer hacker ("Hacker-1") and directed him to create the Fraudulent Opiant Domain.[5] Hacker-1 followed those instructions and created the fake opiant.co.uk domain. On

[5] The conversations between Hacker-1 and AHRAM are in a combination of English and Urdu. The Urdu messages have been translated to English.

or about March 29, 2022, pursuant to ARHAM SHOUKAT's instructions, Hacker-1 created another fake domain, ir.opiant.co.uk (together with "opiant.co.uk," the "Fraudulent Domains").

166. Using the Fraudulent Domains, the SHOUKATS, together and with others, created fake and/or spoofed email accounts mimicking the names of Opiant's actual employees, including its CEO, CFO, Director of Drug Development, and Chief Development Officer (the "Fraudulent Email Accounts").

167. The Fraudulent Domains were both hosted on the Shoukat Server, and the SHOUKATS and others sent test emails to verify that the Fraudulent Email Accounts worked. For example:

a. On or about March 28, 2022, one of the Fraudulent Email Accounts sent approximately five emails to an email address that SHAHWAIZ SHOUKAT controlled. The subject lines said "Testing," "Check now," and/or "testing." SHAHWAIZ SHOUKAT responded to one of those emails with the subject line "Re: Testing."

b. On or about March 28, 2022, one of the Fraudulent Email Accounts sent an email with the subject line "Test" to a Gmail account that SAAD SHOUKAT controlled. SAAD SHOUKAT wrote back, "Thanks for this."

168. On or about April 25, 2022, one of the Fraudulent Email Accounts sent a test email to KHAN's Gmail account.

**The False Release**

169. From at least on or about April 25, 2022 through on or about April 28, 2022, the SHOUKATS, working together and with others, sent multiple emails from the Fraudulent Email Accounts to a legitimate press release distribution service (the "PR Service"). These emails falsely and fraudulently purported to come from Opiant employees and, as discussed below, culminated in the distribution of the False Release.

170. On or about April 25, 2022, one of the Fraudulent Email Accounts sent the PR Service draft language for a purportedly real press release, set to be distributed imminently. This draft release, which was entirely fake, purported to announce positive test results for Opiant's product.

171. On or about April 26, 2022, ARHAM SHOUKAT, used an encrypted messaging app to direct Hacker-1 to create a hyperlink on the fake opiant.co.uk webpage for a potential press release. Hacker-1 followed those instructions and messaged ARHAM SHOUKAT that the page was ready.

172. On or about April 27, 2022, one of the Fraudulent Email Accounts exchanged emails with the PR Service to finalize the press release. One such email from one of the Fraudulent Email Accounts asked to include the following hyperlink to the press release: https://ir.opiant.co.uk/opiant-pharmaceuticals-announces-positive-top-line-results-from-a-head-to- head-pharmacoydnamic-study-for-opnt003-nasal-nalmefene-against-nasal-naloxone/. On or about the same day, ARHAM SHOUKAT sent that same link to SHAHWAIZ SHOUKAT using an encrypted messaging app and wrote "that was us."

173. On or about the same day, ARHAM SHOUKAT sent Hacker-1 via an encrypted messaging app a copy of the draft press release that the PR Service had emailed to one of the Fraudulent Email Accounts. ARHAM SHOUKAT and Hacker-1 then exchanged messages in which they discussed edits to the press release and posting it on https://ir.opiant.co.uk/.

174. On or about that same day, SAAD SHOUKAT emailed ARHAM SHOUKAT an edited version of the same fake press release, which ARHAM SHOUKAT forwarded to Hacker-1 via an encrypted messaging app.

175. Later that day, SAAD SHOUKAT, ARHAM SHOUKAT, and others decided to change the false information contained in the press release. Hacker-1 asked ARHAM SHOUKAT via an encrypted messaging app, "Is this the same scene as Olema?" ARHAM SHOUKAT responded, "No. This is something different. Basically this is a buyout."

176. The next day, on or about April 28, 2022, one of the Fraudulent Email Accounts emailed the PR Service, "We are planning another PR for tomorrow. Can I send you an edited version of it later today?"

177. Later that day, ARHAM SHOUKAT messaged with Hacker-1 that "Saad has sent the information" for a document to be posted on the fake Opiant website.

178. On or about the same day, one of the Fraudulent Email Accounts sent a draft of the Fake Release, which falsely stated that Opiant had entered into a "$225 million commercialization and license agreement" with Company-4. Although that information was entirely false, Opiant—while represented by the Investment Bank where CC-1 worked—had previously discussed a potential deal with Company-4.

179. On or about April 29, 2022, at approximately 9:15 a.m. ET, the PR Service issued the Fake Release, titled "Opiant Pharmaceuticals and [Company-4] announce exclusive $225 million commercialisation and license agreement for OPNT003, Nasal Nalmefene, in Europe and the UK." Approximately seven minutes later, ARHAM SHOUKAT wrote to SHAHWAIZ SHOUKAT on an encrypted messaging app, "its up[,] you see?" ARHAM SHOUKAT then sent a link to the Fake Release followed by a laughing emoji "🤣".

180. Beginning almost immediately after the release, the SHOUKATS and others began broadcasting the Fake Release through social media accounts. For example:

a. At approximately 9:19 a.m. ET, approximately four minutes after the False Release was issued, a user with the handle "AMLSpec" shared a link to the False Merger Announcement on an investment-based social media site. That AMLSpec account was registered using SAAD SHOUKAT's mit.sahin14@gmail.com email address.

b. At approximately 9:32 a.m. ET, AMLSpec again shared a link to the False Merger Announcement, which linked to a fraudulent opiant.co.uk website.

181. After the False Release was issued, ARHAM SHOUKAT sent Hacker-1 a screenshot via an encrypted messaging app that showed a spike in Opiant's stock price. ARHAM SHOUKAT told Hacker-1 to delete the Fraudulent Email Accounts and fraudulent website. Hacker-1 later confirmed, "At this time, there is no trace of opiant.co.uk." ARHAM SHOUKAT responded, "That's the best."

182. Later that morning, Nasdaq halted Opiant trading. ARHAM SHOUKAT conveyed that news to Hacker-1 via an encrypted messaging app, writing, "It's up due to a fake price. Had to happen." Hacker-1 asked, "Did it work out for you guys?" and ARHAM SHOUKAT responded, "Excellently. Bought at 19 and sold at 24. 30% made."

183. At approximately 12:47 p.m. ET, the PR Service issued a press release titled "Opiant Pharmaceuticals Issues Statement in Response to Fake Press Release." The press release stated that: "Opiant had no knowledge of the [False Release]"; the False Release was "fake"; and "Opiant and [Company-4] [were] not involved in any discussions of this type."

**The Scheme's Profits and Losses**

184. The release of the Fraudulent Merger Announcement caused a significant increase in Opiant trading. According to Yahoo Finance, approximately 1,533,300 shares of Opiant stock were traded on or about April 29, 2022, while volumes of the stock never rose above approximately 156,000 shares traded on any given day in the month prior. SAAD SHOUKAT, SHAHWAIZ SHOUKAT, and ARHAM SHOUKAT, were among those who made a profit by trading in Opiant on April 29, 2022. For example:

a. SAAD SHOUKAT sold approximately 72,500 shares of Opiant, resulting in approximately $276,281 of ill-gotten gains from the artificial stock price inflation.

b. SHAHWAIZ SHOUKAT, using trading accounts in Individual-2's name, sold approximately 23,319 total shares of Opiant, resulting in approximately $78,075 of ill-gotten gains from the artificial stock price inflation.

c. ARHAM SHOUKAT sold approximately 12,758 shares of Opiant, resulting in approximately $18,003 of ill-gotten gains from the artificial stock price inflation.

185. On or about April 29, 2022, as the SHOUKATS were selling off their Opiant shares, SHAHWAIZ SHOUKAT wrote to ARHAM SHOUKAT on an encrypted messaging app, "Saad needs to leave London Bc this was too easy." ARHAM SHOUKAT responded, "we[']ll be alright" and "a lot of ppl do it." ARHAM SHOUKAT later added, "opiant was stupid," "they didn't buy opiant.co.uk," and "the [PR Service] fell for it." SHAHWAIZ SHOUKAT asked, "Who paid for it," and ARHAM SHOUKAT replied, "prepaid credit card." SHAHWAIZ SHOUKAT responded, "Need to buy a new phone."

186. The Opiant Manipulation Scheme caused substantial losses to investors, including investors in New Jersey.